WOLF G. TILLMAN, Appellant, v LINCOLN WAREHOUSE CORPO-
RATION et al., Respondents.

First Department, December 27, 1979

## APPEARANCES OF COUNSEL

*Lloyd I. Isler,* attorney *(Sidney S. Rubin* with him on the brief), for appellant.

*Stephen K. Blunda* of counsel *(Quirk & Bakalor, P. C.,* of counsel to *Philip Green,* attorney), for Lincoln Warehouse Corporation, respondent.

*Samuel Halpern* of counsel *(Kohnheim, Halpern, Bleiwas &*

*Greenberg,* attorneys), for Transamerica Insurance Company, respondent.

## OPINION OF THE COURT

MURPHY, P. J.

Plaintiff Tillman brought this action against defendant Lincoln Warehouse Corporation (Lincoln) for its failure to return a substantial portion of the Tillman collection (the "collection"). He sought recovery from defendant Transamerica Insurance Company (Transamerica) on an "all risks fine arts" policy. At the end of plaintiff's case, the trial court granted Lincoln's motion to dismiss the action as against it on the ground that the plaintiff had not proved the collection was placed in Lincoln's warehouse. Defendant Transamerica rested without presenting any evidence. Upon Transamerica's motion, the trial court dismissed the action as against it because plaintiff had not established the date the alleged loss occurred. The court reasoned that a case had not been made against Transamerica since it was possible that the loss could have occurred after the expiration of the insurance on March 4, 1969 and prior to the discovery of the loss on May 23, 1969.

The overriding issue presented upon this appeal is whether plaintiff established a prima facie case against the defendants. Upon a motion to dismiss at the close of plaintiff's evidence on a jury trial, all the fair and reasonable inferences that can be adduced from the evidence must be considered in the light most favorable to the plaintiff. If, upon consideration of such inferences, the plaintiff would be entitled to recover, then the complaint should not be dismissed. *(James v Holder,* 34 AD2d 632.) Before plaintiff's proof is examined in a light most favorable to him, the legal thrust of his three causes of action will be explored.

A basic statement of the law as to the responsibility of a warehouseman for property left with him is found in New York Jurisprudence (rev vol 63, Warehouses and Warehousemen, § 40, pp 55-57): "Those who relinquish custody of their possessions and entrust them to a warehouseman for safekeeping are entitled to a reasonable and well-founded explanation for their nonreturn. While a warehouseman is not an insurer, nevertheless he is supposed to be a careful watchman, who, if he cannot prevent a loss in the exercise of due care, is at least in a position to explain the loss and show that the loss occurred despite the exercise of due care. He has the burden

of explanation for any loss or disappearance of the property bailed and is not entitled to any presumption that he has done his duty. Accordingly, where stored goods have been lost, destroyed or damaged, and the warehouseman cannot establish an excuse for such loss or damage, as where there is insufficient proof that the goods were stolen, he is liable therefor."

Plaintiff's first cause of action against Lincoln was based upon the latter's failure to return 257 pieces in the collection. The second cause against Lincoln was grounded on the same essential facts and sounded in conversion (63 NY Jur Rev, Warehouses and Warehousemen, § 42, p 61; 5 NY Jur Rev, Bailment, § 45, p 55). The plaintiff could recover on either the first or second cause if he could show that the bailed collection was placed in Lincoln's warehouse and that Lincoln failed to return it without any explanation. *(Proctor & Gamble v Lawrence Amer. Field Warehousing Corp.,* 16 NY2d 344, 357.)

■ With regard to the third cause of action against Transamerica, it should be emphasized that there was approximately a two and one-half month hiatus between the expiration of the policy and the discovery of the loss. In view of the fact that the policy was in continuous effect for over 20 years, it could be reasonably argued that it was more probable that the loss occurred before the expiration date (cf. *Aetna Cas. & Sur. Co. v Goldman,* 217 Va 419). Nonetheless, the two and one-half month hiatus does create a real possibility that the loss occurred after the expiration date. Therefore, the trial court properly ruled that plaintiff had the burden of showing that the loss occurred while the policy was in force. (19 Couch, Insurance, § 79:435, p 716; cf. *Brassell v John Hancock Mut. Life Ins. Co.,* 134 Misc 274.)

Turning to the record, plaintiff's evidence indicates that the collection consisted of 284 pieces of Meissen china and pottery. The collection had been owned by plaintiff's parents prior to their deaths. Carl Stern, the executor of the parents' estates, had deposited 112 barrels, cartons and household effects in Lincoln's Manhattan warehouse during the 1944 to 1946 period. The collection was allegedly placed in 11 of those barrels. There is no indication in the record that Lincoln ever inventoried the contents of those 11 barrels or any of the other items placed in storage.

On May 12, 1969, plaintiff's son, Alan, attempted to remove the collection from storage. Alan thought the collection was

then stored in Lincoln's New Jersey warehouse. Alan was informed on that date that the collection could be picked up from Lincoln's Manhattan warehouse on May 23, 1969. Alan and a friend, John Stair, picked up the 11 barrels on May 23, 1969 and took them to the vaults of the Chase Manhattan Bank. An inspection then revealed that the bottom portions of the 11 barrels contained inexpensive crockery. Twenty-seven pieces from the collection were thinly spread over the tops of the barrels.

In order to establish the fact that the collection had actually been placed in the 11 barrels delivered to Lincoln's warehouse in the 1944-1946 period, plaintiff attempted to introduce a "certified inventory and appraisal" (the "inventory"), dated June 7, 1946, against both defendants. This inventory had been made by Samuel Marx, Incorporated (Marx), a firm that specialized in appraising, accounting and auctioneering. Isaac Sobel, one of Marx's appraisers, had compiled the inventory for the executor, Carl Stern. The inventory states that the decedents' property had been examined at Lincoln's warehouse in Manhattan. The inventory was certified by Meyer M. Kipnees, a vice-president of Marx. The inventory was later introduced into evidence in 1946 in the proceedings in the Surrogate's Court involving the estates of plaintiff's parents. Items 1 through 284 of that inventory purportedly described the subject collection.

The trial court ruled that the inventory was only admissible in evidence against Transamerica because it was mentioned in the subject policy; it would not admit the inventory against Lincoln. During the course of the trial, the court further ruled that the inventory had been admitted under restricted circumstances. The court asserted that the inventory was only admitted to show the stated values of the items in the warehouse. The court held that the inventory could not be used to prove that the collection had been placed in the warehouse.

The more narrow issue presented is whether the inventory should have been received against both defendants as proof that the collection was placed in the warehouse. Under the "ancient document" rule, a record or document which is found to be more than 30 years of age and which is proven to have come from proper custody and is itself free from any indication of fraud or invalidity "proves itself" (Fairchild v Union Ferry Co., 121 Misc 513, 518, affd 212 App Div 823, affd 240 NY 666). This rule dispenses with the proof of the execu-

tion of a record or document on the proof of its antiquity. It presumes that the entrant of the record or document is dead after the passage of 30 years. *(Matter of Barney,* 185 App Div 782, 798, 799.)* If the genuineness of an ancient document is established, it may be received to prove the truth of the facts that it recites. (Fisch, New York Evidence [2d ed], § 1016, p 585.)

Since the inventory was over 30 years old and otherwise fell within the strictures of the ancient document rule, it should have been received on an unrestricted basis against both defendants. This document constituted some evidence that the collection was placed in Lincoln's warehouse because it recites the fact that the inspection took place there. In passing, it should be observed that the inventory was also admissible as a business record. It was made in the regular course of Marx' business and it was the regular course of Marx' business to make such a document. (CPLR 4518, subd [a]; *Matter of Kirkby,* 57 Misc 2d 982, 987; see, also, *Matter of Barney, supra,* at p 799; Fisch, New York Evidence [2d ed], § 832, p 482.)

■ Plaintiff, a resident of England, also testified that he visited the warehouse on two occasions. He stated that, in 1947, he examined about 100 pieces in the collection. He further maintained that, in 1963, he inspected the 11 barrels and saw approximately 60 pieces. This testimony was additional proof against both defendants that tended to indicate that the collection had been placed in storage in the 1944-1946 period and was present at certain times thereafter. Any inconsistency in plaintiff's testimony as to the number of pieces he saw on those two occasions could be used for impeachment purposes. Any such inconsistency would not negate his entire testimony in evaluating whether he had established a prima facie case.

■ An attorney named Seavey, who was associated with Carl Stern, also testified that he had visited the warehouse in 1958 for the purpose of increasing the insurance coverage. Seavey was accompanied by an insurance broker named Laibson. At that time, Seavey had a list, similar to the inventory. He was not certain, at trial, whether it was the same list as the inventory. Seavey averred that he and Laibson examined each piece in the collection as against the list that they had. On the basis of this five-hour inspection, the policy coverage was increased to $150,000 by Transamerica's predecessor in

interest, the American Surety Co. Again, Seavey's testimony should have been considered against both defendants as some evidence that the collection was in the storehouse. Furthermore, it should be emphasized that American's representative, McGarrigal, signed the inventory on March 4, 1958. This signature would appear to be added proof, as against Transamerica, that the entire collection was present on that date.

An attorney named Eugene Tuck took over the Tillman estates from the executor, Stern, in 1970. The trial court should have permitted Tuck to testify that the inventory was the only list contained in the file in 1970. Tuck's testimony was relevant on that point because it would have allowed the jury to infer that Seavey used the same list in 1958.

This phase of the case against Transamerica is further strengthened by a policy indorsement, effective March 4, 1966. That indorsement reads as follows: "It is further agreed that the fine arts insured hereunder are now located at Lincoln Warehouse Corporation, 629 Grove Street, Jersey City, New Jersey, Lackawanna Building." By this provision, Transamerica contractually conceded the existence of the collection in the warehouse in 1966 and upon the renewal dates of the policy containing that indorsement.

■ In sum, plaintiff's proof established a prima facie case against Lincoln. Plaintiff demonstrated that the collection was left with Lincoln but that Lincoln never returned it nor offered any explanation for its loss. Nonetheless, as was discussed above, plaintiff was also required to demonstrate that the loss occurred before the expiration of the policy in order to establish a prima facie case against Transamerica. (See *Proctor & Gamble v Lawrence Amer. Field Warehouse Corp.,* 16 NY2d 344, 362, *supra.*)

■■ To show that the loss occurred before the expiration of the policy, the plaintiff pursued two lines of proof. Plaintiff called Jessie McNabb, an assistant curator of the Metropolitan Museum, to establish that two pieces of the collection were pictured in a Paul's catalogue, printed in 1967. If plaintiff could prove that the two pieces in Paul's catalogue had formerly been in the collection in the warehouse, then he would establish that the loss very likely took place before the policy's expiration date. McNabb was asked to compare two photographs of pieces from the collection with two photographs from the Paul's catalogue. She stated, at one point, that she could not tell if they were the same. However, McNabb's answer to this question cannot be considered con-

clusive in the context of this trial. The trial court seriously limited the testimony of this witness by sustaining many objections by defense counsel for Transamerica. As has been mentioned, the trial court ruled that the plaintiff had never shown that the collection was placed in the warehouse. Therefore, it was the court's belief that McNabb's testimony was irrelevant until the plaintiff laid a foundation to establish that the two pieces under discussion had been placed in the warehouse. On appeal, it has now been found that the plaintiff, through the introduction of the inventory and his other proof, showed that the collection was placed in the warehouse. It is quite conceivable that McNabb, an expert in this area, could have testified with a degree of certainty that the two pieces in the Paul's catalogue were the same pieces described in the inventory. In view of the evidentiary rulings on this appeal, plaintiff's attorney will be given freer rein to explore this possibility at a new trial.

Likewise, because of its prior evidentiary ruling, the trial court unduly circumscribed the testimony of Steffie Pincus, an antique dealer. Pincus' husband, then deceased, allegedly bought two pieces from the collection prior to the expiration date of the policy. Again, plaintiff intended to show that the prior sale of those two pieces established that the loss occurred prior to the expiration date. He should be given the opportunity to develop whether Pincus, through a comparison of the two pieces with the description in the inventory, could state either reasonable sureness that the pieces were part of the collection placed in the warehouse. Parenthetically, it should be noted that plaintiff, on the retrial, might be able to establish, through his own testimony, that one of the four pieces was previously stored with the remainder of the collection in the warehouse.

Accordingly, the judgment of the Supreme Court, New York County (EGETH, J.), entered September 11, 1978, dismissing the complaint against defendants Lincoln and Transamerica, should be reversed, on the law, and the case should be remanded for a new trial, with costs to abide the event.

KUPFERMAN, LANE, LUPIANO and LYNCH, JJ., concur.

Judgment, Supreme Court, New York County, entered on September 11, 1978, reversed, on the law, and vacated, and the case remanded for a new trial, with $75 costs and disbursements of this appeal to abide the event.